UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DEBRA KATHERINE TACKETT                    CIVIL ACTION

VERSUS                                     NUMBER: 15-1315

CAROLYN W. COLVIN, ACTING                  SECTION: "A"(5)
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment[1] following a decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's application for Disability Insurance Benefits ("DIB").  (Rec. docs. 12, 14).

Debra Katherine Tackett, *pro se* Plaintiff herein, filed the subject application for DIB on December 3, 2013, with a protective filing date of October 25, 2013, alleging disability as of May 15, 2007.  (Tr. pp. 101-102, 58).  In a "Disability Report-Adult" form that appears in the administrative record below, the conditions limiting Plaintiff's ability to work were identified as hearing loss in both ears, carpal tunnel syndrome in both hands, heart problems, and migraine headaches.  (Tr. p. 119).  Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on March 24, 2014.  (Tr. pp. 68-71).  Pursuant to Plaintiff's request, a hearing *de novo* before an Administrative Law Judge ("ALJ") went forward on October 15, 2014 at which Plaintiff, who was unrepresented, and a

---

[1] Although not specifically denominated as such, the Court construes Plaintiff's filing of September 22, 2015 (rec. doc. 12) as her cross-claim for summary judgment.

Vocational Expert ("VE") appeared and testified.  (Tr. pp. 75-76, 22-49).  On December 22, 2014, the ALJ issued a written decision in which she concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. pp. 5-21).  The Appeals Council subsequently denied Plaintiff's request for review of the ALJ's decision on March 13, 2015, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 1-3).  It is of that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In what is the rough equivalent of her cross-motion for summary judgment, Plaintiff presents a number of procedural issues as well as an overall challenge to the sufficiency of the evidence supporting the Commissioner's decision.  (Rec. doc. 12).  Relevant to the resolution of those issues are the following findings that were made by the ALJ:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2010.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of May 15, 2007 through her date last insured of December 31, 2010 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following medically determinable impairments:  carpal tunnel syndrome; prolapsing mitral valve; irritable bowel syndrome; migraine; anxiety; and loss of visual acuity.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq.*).

5. The claimant was not under a disability, as defined in the Social Security Act, at any time from May 5, 2007, the alleged onset date, through December 31, 2010, the date last insured (20 CFR 404.1520(c)).

(Tr. pp. 10, 11, 16).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision and (2) whether the decision comports with relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not re-weigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner.  *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that she is disabled within the meaning of the Social Security Act.  *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is,

therefore, not disabled.  *Harrell*, 862 F.2d at 475.  In making this determination, the Commissioner employs the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the burden of proving that she is disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5 (1987).  A finding that the claimant is disabled or is not disabled at any point in the sequential review process is conclusive and terminates the Commissioner's analysis.  *Wren v. Sullivan*, 925 F.2d 123, 125-26 (5th Cir. 1991).

In the present case, the ALJ first found that Plaintiff met the insured status requirements of the Social Security Act on May 15, 2007, the alleged onset date, and continued to meet them through December 31, 2010, but not thereafter.  (Tr. p. 8).  That being the case, Plaintiff bore the burden of establishing that she suffered from a disabling condition before the expiration of her insured status.  *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990)(citing *Milam v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).  For a claimant to

demonstrate that she is entitled to DIB, she must prove not only that she is disabled but that she became disabled prior to the expiration of her insured status. *Anthony*, 954 F.2d at 295. "Any impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

Proceeding to the sequential analysis set forth in §404.1520, the ALJ then determined that Plaintiff had not engaged in substantial gainful from the alleged onset date through the date that she was last insured. (Tr. p. 10). Continuing, the ALJ next found that Plaintiff had the following medically determinable impairments through the date that she was last insured: carpal tunnel syndrome, a prolapsing mitral valve, irritable bowel syndrome, migraine headaches, anxiety, depression, and a loss of visual acuity. (Tr. p. 10). However, the medical evidence of record did not establish the existence of a severe impairment or combination of impairments for 12 consecutive months prior to the expiration of Plaintiff's insured status. (Tr. p. 11). As defined by the Regulations, a "severe impairment" is any impairment or combination of impairments that significantly limits one's physical or mental ability to do basic work activities. 20 C.F.R. §404.1520(c); *Shipley v. Sec. of Health and Human Services*, 812 F.2d 934, 935 (5th Cir. 1987). Accordingly, the five-step analysis was concluded at step two and Plaintiff was denied the benefits sought. (Tr. pp. 11-17). The question to be resolved by the Court is thus whether substantial evidence supports the Commissioner's decision that Plaintiff did not suffer from a severe impairment prior to the date that she was last insured.

The medical records admitted in the administrative proceedings below date back to August 29, 2009 when Plaintiff presented to the St. Charles Community Health Center

5

("SCCHC") with complaints of chills, sinus headaches, coughing, and congestion of one week's duration.   Plaintiff was time seen on this date by Nurse Practitioner ("NP") Mary Kay Hartman whose opinions were duly considered by the ALJ, even though she is not considered to be an "acceptable medical source" under the Regulations.  20 C.F.R. §404.1513(a) and (d); *Boudreaux v. Soc. Sec. Admin.*, No. 13-CV-4949, 2014 WL 7339022 at *2 (E.D. La. Dec. 19, 2014).  Plaintiff's past medical history at the time was positive for only migraine headaches of unspecified duration, frequency, or intensity and the results of a physical examination were unremarkable.  The assessment was acute sinusitis and Plaintiff was prescribed Ery-Tab, an antibiotic, and Mucinex.  (Tr. pp. 220-221).

Plaintiff returned to SCCHC on September 21, 2009, complaining of hearing problems, carpal tunnel syndrome, and gastrointestinal issues.  She also complained of occasional migraine headaches (treated with Excedrin Migraine), occasional blocked nasal passages, occasional hot flashes, and anxiety manifested by occasional panic attacks.  Once again, the results of a physical examination were unremarkable.  The assessment was heartburn, prolapsing mitral valve leaflet syndrome, irritable bowel syndrome, microscopic hematuria, carpal tunnel syndrome, common migraine (without aura), and an upper respiratory infection.  Various testing was ordered, including a colonoscopy, an echocardiogram, and a mammogram, and Plaintiff was prescribed Phenylephrine, Dicyclomine, and Bactrim.  (Tr. pp. 215-219).  Plaintiff apparently underwent audiometric testing on September 22, 2009 but the results of that testing are not apparent from the record.  (Tr. pp. 213-214).  She called SCCHC on October 1, 2009 to obtain the results of the recent lab work, which were normal except for high cholesterol.  A follow-up appointment was to be scheduled.  (Tr. pp. 211-212).

Pravastatin was ordered on October 8, 2009 to treat Plaintiff's high cholesterol.  (Tr. pp. 209-210).

      Plaintiff was seen again by NP Hartman on January 25, 2010 to obtain a refill of her Pravastatin.  (Tr. pp. 207-208).  Blood was drawn on March 6, 2010 for the purpose of a comprehensive metabolic panel and a lipid profile.  (Tr. pp. 205-206).  On March 13, 2010, Plaintiff was notified to schedule an appointment to obtain the results of that testing.  (Tr. pp. 203-204).  She did so and was apprised of the results telephonically later that same day. (Tr. p. 202).

      On March 20, 2010, Plaintiff returned to NP Hartman and reported hearing voices telling her to kill her husband.  Physical examination findings were again unremarkable.  The assessment was familial hypercholesterolemia, major depression (single episode), and generalized anxiety disorder.  Plaintiff was prescribed Lexapro and Alprazolam, was given a refill of Pravastatin, and was referred for audiological and behavioral health assessments. (Tr. pp. 199-201).  Plaintiff was next seen by NP Hartman on June 12, 2010 for follow-up care of her high cholesterol and to obtain medication refills.  No adverse physical examination findings were noted.  The assessment was pre-mammogram screening and high cholesterol. Bloodwork and a mammogram were ordered and Plaintiff was given only a refill of Pravastatin and was instructed to take a low-dose aspirin once per day.  (Tr. pp. 195-198).

      The next medical records were not generated until April 14, 2011, three and one-half months after Plaintiff's insured status had expired, when she returned to SCCHC and was seen by NP Kawander Parquet for a growth on the nose and stomach problems in the form of heartburn with no nausea or vomiting.  Plaintiff advised the examiner that she did not feel tired or poorly and she had no headache, chest pain or discomfort, chest congestion, dyspnea,

cough, changes in urinary habits, or dysuria.  Her cardiovascular system and abdomen were normal and she had a normal heart rate and rhythm.  The assessment was irritable bowel syndrome, a change in skin texture, and esophageal reflux.  Plaintiff was prescribed a 30-day supply of Rantidine.  Gastroenterological and dermatological consultations were ordered.  (Tr. pp. 192-194).  Plaintiff returned to NP Parquet on June 17, 2011 after falling down the stairs and hurting her right foot the previous day.  She also complained of sinus problems.  Plaintiff denied any chest pain or discomfort, palpitations, or dyspnea.  Although Plaintiff complained of right foot involvement, a physical examination revealed 1+ edema to the left foot and pain with range of motion as well as ecchymosis.  The assessment was foot pain and allergic rhinitis and Plaintiff was prescribed Ibuprofen and Ceron-DM as needed for pain and allergy symptoms.  (Tr. pp. 189-191).

It would be over seven months before Plaintiff was seen again for medical care when she presented to NP Parquet on January 20, 2012 for medication refills.  The treatment note from that date was positive for heartburn but no other symptoms and the results of a physical examination were normal.  The assessment was esophageal reflux.  Plaintiff was given a refill of Ranitidine and was counseled on the avoidance of spicy foods.  (Tr. pp. 186-188).

The next set of medical records was not generated until August 15, 2013 when Plaintiff was seen at the East Texas Medical Center in Jacksonville, Texas for complaints of abdominal pain for the previous week.  Following testing and the administration of fluids, Plaintiff was released the same day with a diagnosis of viral gastroenteritis and prescriptions for Zofran ODT, Lomotil, and Bentyl.  (Tr. pp. 225-252).

On March 17, 2014, Plaintiff underwent a consultative eye examination by Dr. Daniel M. Gold.  The history associated with Plaintiff's visual acuity at the time was described as glare from sunlight and car lights causing blurry vision and frequent migraines at a rate of about once per week.  The diagnosis was nuclear sclerosis cataract and myopia in both eyes, with no treatment deemed to be necessary.  Dr. Gold remarked that "[c]ataracts are age-appropriate and will continue to develop" and that Plaintiff had been given prescription glasses to improve her vision as "[c]ataracts cause blurry vision and glare."  Like any person over the age of 40, it was recommended that Plaintiff obtain annual eye examinations.  With correction, her distance vision was 20/40 in both eyes.  (Tr. pp. 266-270).

Plaintiff returned to SCCHC on April 22, 2014 where she was seen by Physician Assistant ("PA") Christine McDaniel.  Although the purpose of the visit was described as a "general check up" Plaintiff did complain of a rash to the back of the neck.  She also inquired about the completeness of her previous medical records as she had by that time applied for Social Security benefits.  Plaintiff reported feeling tired/poorly and advised PA McDaniel of experiencing symptoms of irritable bowel syndrome.  She also reported swelling to the joints of the hands as well as stiffness and hip-joint pain.  Plaintiff's sole medication at the time was Ibuprofen three times per day.  Upon physical examination, the prominent bone of Plaintiff's lateral wrist appeared abnormal and pain was elicited with motion of the hands but no swelling or erythema were present.   The Phalen's maneuver showed hand numbness/tingling in the median nerve distribution but the Tinel's sign was negative.  Plaintiff also had dry patches of skin with maculopapular lesions to the back of neck and into the scalp.  The assessment was hand pain and lethargy.  Testing was ordered and Plaintiff

was prescribed Ketoconazole shampoo and Hydrocortisone Valerate cream. (Tr. pp. 297-300). The ordered labwork was done on May 12, 2014. (Tr. pp. 292-296).

On May 19, 2014, Plaintiff was seen again by PA McDaniel for the purpose of obtaining the recent test results. Plaintiff reported persistent hand swelling and pain on and off for years as well as hearing loss but had never consulted with an orthopedist or an audiologist. There was tenderness to palpation of the hands and lateral tenderness with pain being elicited by motion. However, the appearance and motion of the hands was normal with no weakness. The assessment on this date was hyperlipidemia, hand pain, abnormal thyroid findings which had resolved, and hearing loss. Lovastatin was prescribed and Plaintiff was to consult with an orthopedist. (Tr. pp. 286-291). Plaintiff requested a referral to a dermatologist for a mole check on June 13, 2014. (Tr. pp. 283-285).

Plaintiff was subsequently seen by NP Mary Jo Broussard of the Interim LSU Public Hospital on August 5, 2014 for complaints of weakness in both hands and pain and mild numbness in the thumb and fingers. Exacerbating factors were identified as gripping, lifting, and repetitive activity. Plaintiff had normal sensation to the fingertips bilaterally on physical examination but bilateral volar ganglion cysts were noted over the radical aspect of the wrists. Tinel's testing produced pain radiating proximally toward the elbow and a Phalen's test was positive bilaterally. Mild atrophy was present. Range of motion was within normal limits but Plaintiff had hand pain with any motion as well as joint pain with compression. X-rays revealed bilateral basal joint arthritis, the left greater than the right. The assessment was bilateral carpal tunnel syndrome; bilateral joint arthritis, the left greater than the right; and, bilateral ganglion cysts to the volar radial aspect. Nerve conduction studies and an EMG

were to be performed, wrist splints were recommended for night use, and Plaintiff was prescribed Naproxen in place of Ibuprofen.  (Tr. pp. 302-305).

On August 11, 2014, Plaintiff returned to SCCHC where she was seen by Dr. Alana Anthony for the purpose of obtaining a referral to an audiologist and for hand pain.  Physical examination findings were unremarkable; the requested referral was made.  (Tr. pp. 279-282).  An EMG was apparently conducted on August 18, 2014 but the results of that testing are not apparent.  (Tr. pp. 306, 311).  When Plaintiff was next seen by NP Broussard on August 26, 2014, she reported that the Naproxen had made her nauseous and caused vomiting and that her primary care physician had changed it back to Ibuprofen.[2]  Plaintiff also advised NP Broussard that her primary care physician had administered a steroid injection for right hip sciatica which also caused nausea and vomiting.  The examiner apparently had access to the EMG results of August 18, 2014 which showed moderate carpal tunnel syndrome on the right, mild on the left, and bilateral volar wrist ganglion cysts.  Physical examination results revealed decreased sensation bilaterally in the first through fourth digits, a positive Tinel's sign on the left, and a positive Phalen's test bilaterally, the left worse than the right.  However, there was no atrophy and range of motion was within normal limits.  The assessment was bilateral carpal tunnel syndrome, bilateral volar ganglion cysts, and first CMC joint arthritis.  A surgical consultation was to be scheduled and Plaintiff was to continue with Ibuprofen and the use of splints.  (Tr. pp. 312-313).

The final medical records that were admitted in the administrative record below document Plaintiff's evaluation by Dr. Kelly Lynn Babineaux of the Interim LSU Public Hospital on September 19, 2014, almost four years after the date that she was last insured.

---

[2] The administrative record contains no treatment notes from any such primary care physician.

Physical examination findings were essentially the same as those that were recorded on August 26, 2014 as were the assessment and treatment plan.  Surgery was to be scheduled. (Tr. pp. 314-315).

   As noted earlier, a hearing *de novo* before an ALJ went forward on October 15, 2014. Although her recall of the 2010 time frame was less than crystal clear, Plaintiff testified to experiencing problems with her hands for some 25 years, first seeking medical care for them in 2009 and experiencing a worsening of her condition in 2010.  Even then, she had only been prescribed Naproxen or Ibuprofen and the use of splints.  Plaintiff further testified to a worsening of her hearing in 2009 as well as the onset of migraine headaches twice per month that were treated with over-the-counter medication.  Plaintiff also reported suffering from mitral valve prolapse since 1985 but she was able to work over the years despite that condition.  In 2010, Plaintiff recalled seeking medical care after hurting her foot.  NP Hartman had since retired and Plaintiff began seeing Dr. Anthony in her stead.  While it was not identified as a disabling condition in her application for Social Security benefits, Plaintiff testified to first being diagnosed with depression in 1996, prior to undergoing a hysterectomy, for which she took Prozac for six months before discontinuing it.  In August of 2014, she had reportedly been prescribed Paxil but had been transitioned to Prozac after experiencing some side effects.  Plaintiff had a driver's license and could drive as of the time of the hearing.  (Tr. pp. 24-26).  Patricia Knight, a VE, then testified as to the strength and skill demands of Plaintiff's past work, following which the hearing was concluded.  (Tr. pp. 46-49).

   In reviewing the correctness of the Commissioner's decision, the Court's role is extremely circumscribed and is limited to determining whether the decision is supported by

substantial evidence, a highly deferential standard of review. *Fortenberry v. Harris*, 612 F.2d 947, 950 (5th Cir. 1980). The law is also clear that the Plaintiff bears the burden of producing objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989). Unfortunately for Plaintiff, the objective medical evidence admitted in the proceedings below does not establish the existence of a severe impairment – one that significantly limited Plaintiff's ability to perform basic work activities – for 12 continuous months prior to the expiration of her insured status. *See* 20 C.F.R. §404.1509 (12-month duration requirement).

The Court recalls that Plaintiff protectively filed for DIB on October 25, 2013, nearly three years after her insured status had expired, alleging disability as of May 15, 2007. The significance of the latter date is not entirely clear but, according to the "Work History Report" that Plaintiff completed, the alleged onset date falls in between a job that she had performed up until some time in 2005 and a brief stint of work that she had in early 2008. (Tr. p. 129). Be that as it may, the medical records that were admitted below all post-date the alleged onset date by nearly two and one-half years and more. The first of those medical records document Plaintiff's treatment for week-long flu-like symptoms on August 29, 2009. Plaintiff's past medical history at the time was positive <u>only</u> for migraines, the results of a physical examination were normal, and the diagnosis was simply sinusitis for which antibiotics was prescribed. Approximately one month later, Plaintiff complained of a variety of conditions, including hearing issues, carpal tunnel syndrome, occasional migraines, and anxiety, but a physical examination again produced normal results. Despite those unremarkable results, the diagnosis was heartburn, prolapsing mitral valve leaflet

13

syndrome, irritable bowel syndrome, trace hematuria, carpal tunnel syndrome, common migraine, and an upper respiratory infection.  Of those listed conditions, only the latter appears to have warranted treatment, and only antibiotics were prescribed to treat that condition.  Audio testing was possibly conducted the following day but, if so, the results are not included in the administrative record.  On October 1, 2009, Plaintiff was informed of bloodwork results that were normal except for elevated cholesterol.  One week later, Pravastatin was ordered to control that condition.

On March 20, 2010, Plaintiff reported hearing voices telling her to commit untoward acts against her husband.  Once again, a physical examination produced normal results.  The assessment was high cholesterol, major depression (single episode), and generalized anxiety disorder.  On this occasion, Plaintiff was prescribed Lexapro and Alprazolam in addition to Pravastatin.  Plaintiff was also referred for audiological and behavioral health assessments but there is no indication that those ever took place.  Plaintiff returned to SCCHC on June 12, 2010 for follow-up care of her high cholesterol and for medication refills.  A physical examination yielded normal results.  The assessment was pre-mammogram screening and high cholesterol.  As Plaintiff was given only a refill of her Pravastatin and was instructed to take a low-dose aspirin daily, it can reasonably be inferred that the depressive symptoms that she had been treated for on March 20, 2010 had resolved and were no longer an issue.  The records from this June 2010 clinic visit were the final ones before Plaintiff's insured status expired on December 31, 2010.  The medical records that would be generated subsequent to the latter date, those from April 14, 2011, June 17, 2011, and January 20, 2012, document Plaintiff's treatment for various conditions such as a skin growth on the nose, heartburn, and a foot injury.  Even when Plaintiff next sought medical care on August 5, 2013,

14

it simply was for week-long symptoms of viral gastroenteritis.  From that point forward, the records of Plaintiff's treatment become more remote in time to both the alleged disability onset date and the expiration of Plaintiff insured status for DIB purposes.

As respects the time period that Plaintiff was last insured, what the Court is confronted with are the records of five office visits that she had with a nurse practitioner, someone who is not an acceptable medical source under the Regulations, documenting Plaintiff's complaints of flu-like symptoms, what appears to have been an isolated incident of depressive symptoms, and of hearing problems, carpal tunnel syndrome, gastrointestinal issues, occasional migraines, blocked nasal passages, hot flashes, and anxiety on one occasion.  On each of those occasions, the results of physical examinations were normal and on none of those occasions or any of the other ones that are documented below did any medical examiner place any restrictions on Plaintiff's activities, a proper consideration in the Social Security context.  *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995).  In terms of treatment, Plaintiff was prescribed only antibiotics, high cholesterol medication, and a short course of anti-depressants.  Simply put, the above-described objective evidence does not establish the existence of a severe impairment or combination thereof for a continuous period of 12 months prior to the expiration of Plaintiff's insured status.

The issues raised by Plaintiff in her filing of September 22, 2015 (rec. doc. 12) do not alter the Court's conclusion.  While Plaintiff claims that she was denied the opportunity to be represented by her husband at the administrative hearing, the record contains an unambiguous waiver of representation form that she duly executed prior to the hearing and the colloquy that she engaged in with the ALJ establishes that her waiver was knowing and voluntary.  (Tr. pp. 100, 24-25).  A review of the transcript reveals no instances where

15

Plaintiff's ability to communicate with the ALJ or to effectively participate in the proceeding was compromised.

Next, Plaintiff complains that she should not be penalized for the lack of objective evidence to support her application for DIB as she had to stop seeking doctors' care in 2011 because she had no income or medical insurance.  As noted above, however, the relevant time period at issue expired on December 31, 2010 and, in any event, the record reflects that Plaintiff was seen at SCCHC in 2011, 2012, and 2014.  Finally, Plaintiff argues that her carpal tunnel issues pre-dated the expiration of her insured status as evidenced by surgery to her hands subsequent to the administrative hearing.  Although Plaintiff complained of carpal tunnel-related symptoms on September 21, 2009, the results of a physical examination on that date were normal, as were all of those that were performed prior to the expiration of Plaintiff's insured status.  In fact, it was not until Plaintiff's evaluation by PA McDaniel on April 22, 2014 that any adverse physical examination findings relative to Plaintiff's hands were reported.  Even then, the diagnosis was simply hand pain and no treatment was ordered.  At best, the surgical procedures that Plaintiff underwent in 2014 and thereafter point only to the degeneration of a condition that was previously and properly found to be non-disabling.  *Torres v. Shalala*, 48 F.3d 887, 894 n. 12 (5th Cir. 1995).

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendants' motion for summary judgment be granted, and that Plaintiff's suit be dismissed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14

days after being served with a copy shall bar that party, except upon grounds of plain error,

from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object.  *Douglass v. United States Auto. Assoc.*, 79

F.3d 1415 (5th Cir. 1996)(en banc). 3/

        New Orleans, Louisiana, this __3rd__ day of _____May_____, 2016.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

3/ *Douglass* referenced the previously-applicable 10-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.